Good morning. May it please the court, I'm Craig Crispin on behalf of Plaintiff Appellant Ray Cornwell. First thing I'd like to do is make sure we have the appropriate context for what this case is all about. We're dealing with a fairly high level executive, a Chief Operating Officer of a corporation, Electra Credit Union. And the parties on the other side that are coming forward with their position and their evidence in this summer adjustment proceeding are the CEO and the board members. So we're not dealing with a situation where we have, for example, a laborer on the manufacturing floor and a supervisor. These are sophisticated folks that we're not going to find things like open statements of discrimination. We're going to find things that are under the radar typically. And this is exactly why the law sets forth the kind of procedure that we have in McDonnell Douglas and precisely why circumstantial evidence is just as valuable as direct evidence in determining whether or not there's sufficient evidence to get to a jury, which is why we're here today. Well, I sort of thought Costa had addressed and resolved the issue of drawing distinctions between direct and circumstantial evidence. Right. Essentially, circumstantial evidence is just as good, sometimes better, than direct evidence is the import of that. Let me kind of go through some of the timeline. I don't think our briefs actually set forth the sequence in as – When you do that, that would be useful. But you opened with one of the things that actually does trouble me about this case, and that is it's not unusual at the senior management level, particularly the highest levels, so CEO and COO, for the new guy being brought in at the top to pretty much want his or her own team. And a lot of what seems to be going on, if one takes the evidence most favorable to the client, and assuming that these events happen, is that Steele – is it Steele? Is his name? Sharp. Sharp. Sharp. Took some steps to sort of force out your client. So let's assume that for the moment. That's sort of corporate politics, and you're bringing a racial discrimination claim. So because Mr. Cornwall is African American, that gives you at least the notion that it may be racial. But where in your – as you go through, where in your evidence is there, beyond that, the fact that he's black, that there is anything going on here besides corporate politics, which has nothing to do with racism. You didn't ask – I don't know if there's any mixed motive claim in here, but in any event, if you could address that as you go through your timeline, that would be helpful for me. Sure. Let me preface that with saying what we're not claiming. We agree completely. A CEO, for example, has complete authority to conduct a reorganization, even if that happens to disadvantage some individual. There's no question about that. And that's never been what we've claimed in this case. What we've claimed in this case is that Mr. Cornwall, as an African American, was treated differently than the others of the management team, his peers, the vice president-level individuals, and that once he – we've got the parallel things here on the retaliation for the complaints of the sexual harassment. But once he complained to the vice president of human resources, and once he was excluded and marginalized even before this decision to reorganize was made, that that indicates that he was the one, individually, that was being affected. Now, his African American race is important because he, as an African American, is treated differently from his peers who are Caucasian. There is no evidence that there were other racial minorities or people of color in the relevant group there who were treated also favorably like the Caucasians. So when we get into the – Was he the only minority in the management structure? He was the only minority on the level that we're talking about, the management team, with the vice presidents and perhaps one or two slightly lower individuals. But this is actually where it starts, is that when Jim Sharp became CEO, and that was in September of 2001, he comes in. And at that particular point in time, Mr. Cornwall is the chief operating officer. What happens immediately is that Mr. Sharp starts dealing with all the Caucasian peers, but he doesn't go to the one person that would make the most sense to learn what's going on and to think about a reorganization if that's, in fact, what he was going to do. May I ask you this question? Absolutely. Was anyone but Mr. Cornwall demoted as a result of the reorganization scheme that Mr. Sharp brought in? No, the only other – Then isn't that another reason why Mr. Cornwall didn't talk to Mr. Sharp and did talk to the other people because he had made up his mind that Cornwall's duties would be limited? Well, I think that's compressing the dates a little bit too much. We have September 2001 through the date of the demotion in December, December 12, 2001. So we have September, October, November, and December. That's the period where Mr. Cornwall testified that he was excluded from regular meetings with Mr. Sharp. He didn't attend and he identifies other specific meetings where others were in with Mr. Sharp. He didn't get the same kind of attention in terms of various lunches and other exploratory meetings that Mr. Sharp had with the other vice presidents. What he did have during this period of time before the reorganization was decided upon was one lunch meeting, which is very important. And in that lunch meeting, Mr. Sharp tells him, essentially, in words close to this, if anybody on my team goes over my head, they're going to be fired. And that's important in context with what happens then in the first week of November 2001 when Mr. Cornwall and the other members of the management team meet at Mr. Sharp's home for a management team meeting where Mr. Sharp makes a variety of sexually inappropriate... They serve alcohol. Well. And they, so, but where is this going in terms of racial discrimination? Well, we have two claims. We have the retaliation for the reporting of the sexually harassing conduct, and that reporting occurred on November 12th. I'm assigning the two. I thought you were setting aside retaliation and focusing on race. I understand you have two arguments. I was hoping to get you focused on the racial claim because, as I said, a lot of activity, including the one we're just about to get to, could be corporate politics unrelated to race. It may have been related, as you say, to the sex discrimination complaint, but that's a separate issue. Anyway, that's sort of, if you keep that in focus when you're making your points, that would be helpful. And I think it's important to realize that even though a set of facts can be read one way, as defendants in their briefs try to present it, and as we could, you know, as reasonable people say, that could be corporate politics. Well, you're on summary judgment. I understand you get the benefit of a lot of the doubt. I'm still trying to, when you go through this, focus on what the indicia of race are, aside from your status as being African American. Well, we're not going to have a situation where Mr. Sharpe says to Mr. Cornwell, I don't like the color of your skin. No, that's not going to happen. So you look at, instead, you look at just what doesn't square right in the sequence with their explanation. And let me go through the sequence. First of all, for the first few months, as supposedly the period where Mr. Cornwell would be the one to talk about the changes, Mr. Sharpe ignores him, except to tell him that anybody a little over my head would be fired. Then, as it comes close to the point of the demotion, there is no consultation about how to shift off this important portion of Mr. Cornwell's duties onto somebody else. He's the one that would seem most logical to go to and say, okay, I'm going to do this. I know you're not happy about it, but work with me on how we're going to do it. He doesn't. Instead, Mr. Sharpe takes a subordinate employee who has no experience and promotes her to a vice president level to take over that portion of the duties that Mr. Cornwell is being stripped of. She's Caucasian, of course. So he gives Mr. Cornwell no opportunity to consult, to talk about it. Instead, 445 or so in the afternoon, the day before he's going to announce it, Bonnie Cottrell says, well, why don't you go ask him? Mr. Cornwell goes and asks him, and he says, we're going to take you out of your position and strip half of your duties. Mr. Cornwell expresses some concern about that, of course, and the immediate response is, if you don't like it, I can help you get a job somewhere else. Throughout the defendant's materials, they talk about how Mr. Cornwell is the one with all this great skill in lending. And yet, Mr. Sharpe is sitting there saying, well, if you don't like it, hey, here's the door, immediately. This is repeated the next day. He comes in and has this management meeting where he announces, okay, I'm going to change things, and Mr. Cornwell is now going to be stripped of half of these duties, and will you all commit to it? And he places Mr. Cornwell in a situation that is not nice, but I don't think it indicates much. Except then, again, they go outside, and Mr. Sharpe's response when Mr. Cornwell says, you're really putting it to me, he says, well, why don't you quit? Or worse, that's an act, and that's the inference that the jury is entitled to draw from whatever his words were in talking about the invitation to go elsewhere for employment. And your point is that nobody else at his level or comparable was subjected to that kind of isolating and gruntry treatment? Well, when you look at, essentially, yes. When you look at how the Caucasian employees were treated in that management team, and then Mr. Cornwell, you have that disparity, but also when you look at how Mr. Cornwell is treated, it doesn't make sense that if Mr. Sharpe's claims of acting only on a reorganization were accurate, that he would hide the ball from Mr. Cornwell, that he wouldn't ask for his input, that he would ask him to quit. At the factual level, as I understand it, one of your points is that Mr. Sharpe did not consult with Mr. Cornwell about transitioning his duties, these general administrative duties about the other branches to the other employee, correct? Right. He didn't consult with him before he announced it. Right. And second, if his purpose was to try to get Mr. Cornwell to focus on lending, he didn't have any prior discussion with Cornwell about that either, did he? He did not. I want you to narrow your focus to lending, because that's more important to us now or something. There was no prior discussion, other than the brief meeting the day before it was announced, where Sharpe claimed he'd already made up his mind, assumed that he did, and invited Mr. Cornwell to quit. There's a legal issue I'd like you to touch on at some point here, and it relates to the point Judge Fischer made about COSTA. As I read the district court's ruling on the summary judgment, and I don't know that I can point you to the page right now, but I thought that the district court said that the circumstantial evidence of discrimination wasn't sufficient to meet the test of substantiality required by McGinnis, a prior Ninth Circuit case. But that case preceded COSTA, so at a minimum, wouldn't we have to send this back to the district court to assess whether the circumstantial evidence taken as a whole was sufficient to create a fact issue without regard to distinguishing between circumstantial and direct evidence? I think I agree with you. I'm not totally sure, but I think that the focus on what is substantial is really another way of saying, is there sufficient evidence for a reasonable jury to conclude that discrimination occurred? As I read the cases that talk about substantiality of the evidence, there has to be some evidence. There has to be a logical set of facts that occur that a reasonable inference could be made that discrimination was a part of it. Under COSTA, in the mixed motive analysis, it needn't rise to the level of a predominant factor. So I think that this court can make the decision, although if it wanted the district court to go back and deal with the factual analysis specifically under COSTA, I think that would be an appropriate resolution as well. I think we have the set of facts, the sequence. What about the most dramatic, if you will, although it's argued to be a stray remark and you lost your motion on that, to reopen discovery to make it a record, was the racial epithet. How does that factor into any of it? Well, I think that with that demonstration of Mr. Sharpe's racial animus, that that fact alone very well may be enough to say that's direct evidence of intent, and that would take the whole case. Without it, I still think that the sequence as things went through and the rush to judgment, for example, the rush to declare Mr. Cornwell having been resigned, and despite the fact that Mr. Cornwell is sitting in his office going to work, that Mr. Sharpe comes in and announces that he's resigned, and that sends him home. The rush to judgment at the end when the termination occurs, when they're trying to work out a period of time over the course of a period of days that Mr. Cornwell can come see a lawyer, then there's a rush to termination. There's no reason to terminate. The administrative leave was going in unpaid status. But there was a rush to take him out the door. All of those things together, the boards ignoring the racial discrimination complaint that Mr. Cornwell made. You get from the very top, Mr. Cornwell comes in and makes a complaint, two pieces to it, the sexual harassment part, and that this is race. He puts it in diplomatic language because he's in the corporate politics, but he raises that. The response of the board is we looked at Mr. Sharpe's authority to make organizational changes, and he has that, of course. Nobody disagreed with that. And we're not going to second-guess his motives. We're not going to look into what motives might have existed, meaning we're not going to look into whether race played a factor. The board just stepped out and washed its hands of those complaints about race discrimination. It didn't do anything. That's an indication that this organization did not care whether race was a factor or not. I'm still not clear on the racial epithet, though. The district court did not take that into account. What's your argument as to why that was an erroneous exclusion? The standard is abusive discretion, and we understand that. We think that a 30-minute deposition that could have been scheduled in a matter of two or three days, most likely, would have taken very little. Why wasn't that done in the first instance? It was that powerful evidence. Why didn't you have the 30-minute deposition? You knew they were going to move for assembly judgment. I also knew wrongly, as it occurred, that this individual was someone I could get an affidavit from. I talked to her. I knew the information. There was no indication before I went to her and said, I need this affidavit, that she was afraid to do it. Frankly, I typically do not go out and give away all of my good evidence by putting my witnesses in a deposition. That's the problem, isn't it? It is. It's a strategic choice one makes in that position. Unless there's questions right now, I'll reserve a minute and sum up. All right. Thank you. Good afternoon, Your Honors. My name is Richard Manighello, and I'm representing the individual defendant, James Sharp, in this matter. The sole claim against Mr. Sharp is a Section 1981 race discrimination case. So besides any lingering questions that may exist regarding the motion to reopen discovery, I'm going to be limiting my presentation to a discussion of those matters. And then at the ten-minute mark, we'll be yielding the remainder of our time to Karen Saul, who's representing Electric Central, to answer any additional questions about race discrimination and then also to address the retaliation claim. Let me get you right to the primary concern I have. The district court, at page 16 of his opinion, which is ER 111, says, I conclude Cornwell has not preferred specific and substantial evidence to raise a factual issue of the true reason of his demotion or termination was race discrimination or that the stated reasons were false. My concern here is with cost. I had understood this specific and substantial evidence standard to be one that pre-COSTA was required when a circumstantial evidence case was presented. But after COSTA, I'm not sure that the district court could require that. In other words, it seems to me the only issue was whether under Liberty Lobby or whatever the current summary judgment standard case is that's predominant, whether there's a genuine issue of material fact taking into account all of the circumstantial evidence. And there is some circumstantial evidence. So why wasn't the district court's legal standard incorrect, the one I just read, in light of COSTA? Okay, I think I can answer that in two different ways, Your Honor. First, I believe a close reading of COSTA, when they measure direct evidence versus circumstantial evidence, is talking about how that would be portrayed to a jury at the trial stage. So therefore, a jury should not be instructed, if it's circumstantial evidence, they've got to prove a whole lot more than if it were direct evidence. So there may be a distinction at the summary judgment stage. Whereas at the summary judgment stage, because you do require specific evidence, since circumstantial evidence is not necessarily specific, there is a heightened requirement. That I don't think. Okay. I was on COSTA. I don't think so. Okay. See, I was on the dissent in COSTA in the Ninth Circuit. And I followed this specific and substantial evidence test that a whole bunch of circuits had followed. And the Supreme Court then said, no, sorry, we're not going to make this distinction with direct and circumstantial evidence. We tried to tell you that. I know. The majority was absolutely prescient, I would say. But the point is, apart from considering the evidence and whether it's sufficient, I do have this concern that the language of the standard articulated is from pre-COSTA era. Well, I don't believe solely, even if Judge King were to have miswritten his opinion, and by citing that standard, the summary judgment is a de novo standard. So this court can take a brand new look at it. It doesn't simply have to say, Judge King, you got the standard wrong. Take a look at it anew. Why isn't there sufficient evidence to go to a jury? Look, the guy is the highest ranking executive of a minority group in this relatively small group of upper management, right? Correct. He's been there eight or nine or some significant period of time. Correct. He's performed his job, so far as the record shows, without any difficulty or inappropriate or deficient conduct. Well, except for the fact that it's clear in the record that there were substantial losses in the lending portion of the business, which was his primary focus. I didn't see anything in the record that indicated that losses were attributed to some deficiency with the executive. That is correct. Exactly. Okay. So now if the company with a new CEO wants to reorganize and shift executives around, okay, I know that happens a lot. I represented corporations for a few decades, but what seems odd is that Mr. Sharp would not consult with Mr. Cornwell, would not talk to him before announcing a decision. I'm not saying it couldn't happen, that it couldn't be legitimate, but that alone may raise a fact issue, a genuine issue of fact on motives that a jury could sort out. You know, the jury could believe Mr. Sharp or they could not believe him. Sure. Well, I believe there's still a level that the plaintiff must meet when presenting circumstantial evidence. I do not believe that any level of circumstantial evidence where you can draw any potential inference, no matter how far stretched, would be enough to send it to a jury. I think there's got to be a line drawn somewhere. If he's the only African-American executive in the company, I'm not sure it's that far of a stretch when he's not even consulted. The second thing that was of concern to me was it seemed like the company did not even evaluate the issue that he raised by his questions. In other words, when he spoke to the director, he said something like, you know, I don't know if he doesn't like the color of my skin or he'd rather have a woman or, you know, whatever, or he doesn't like me personally. Those issues, when the company reported back, were not addressed. They addressed, I guess, the inappropriate behavior or inappropriate sexual harassment behavior at a cocktail party. They may have addressed another issue, but they did not address he may not like me because of the color of my skin. And I think there might be some precedent that would indicate that a failure of a management to address an issue could be taken to support an inference that would be adverse to your client. Well, I'm going to the extent it's necessary. If this issue goes to Sharpe and, I guess, that issue may go more to Electra than to Sharpe. Exactly. What I would point out is one of the cases cited by Plaintiff McGinnis, there is one line in there where they do talk about a permissive response to racial discrimination. Allegations could be evidence of pretext. But in that case, it ranges much, much further. And, in fact, the cases cited by Plaintiff, all which demonstrate level of pretext, are much different than this one. The McGinnis case where there was specific evidence that GT was potentially lying about a hiring freeze, which is why they didn't promote somebody. Also, the other case I would point to is the Godwin case, which is a 1998 case, where the company rejected somebody when she asked why they rejected her. She said, well, we were looking for somebody with creativity. That was the key reason why we didn't hire you. And yet, that was nowhere in any of the hiring materials in terms of the standards why they hired somebody. And she, in fact, had much better evaluation scores than the person they ended up hiring. Also, the Schnidry case where somebody was told, a plaintiff was actually told, the reason we're not hiring you is because we want somebody who is younger. Those cases, there's nowhere near the circumstantial evidence in this case that there was in those. And I believe this case is much more closely tied to the Manat case where- What about the direct evidence of racial animus on the part of your client on the racial epithets? Yes. Well, I believe, Your Honor, in terms of the standard of how it's presented here today, the motion to reopen discovery, if you look at the Panatronic or the U.S. cellular cases, this is a two-step process. Number one, did the plaintiff diligently pursue discovery opportunities? That's the reason why Judge King went no further. He just solely said, no, there's no way that it was diligently pursued. But secondly, even if there was an open question about that, the second level is then, would it have precluded summary judgment? Not whether there's a question. Would it have precluded summary judgment? I would point to the Nidds v. Schindler case, which we cite, where there was direct evidence made by the supervisor, yet it was not in relation to the termination. Whereas here, there was a statement made, we don't know whether it was before, after the termination, and it certainly wasn't regarding the plaintiff. It certainly wasn't at all tied to the termination decision. For those reasons, we think even if that evidence were in a play in this case, it wouldn't be direct evidence and it wouldn't be enough to preclude summary judgment. Okay. Just from where I'm analyzing it for your client's issues, I'm viewing it right now, subject to further argument in conference, that it's not an abuse of discretion for the court to keep out the evidence of this remark. The evidence wasn't excluded. You just wouldn't permit discovery after the discovery cutoff. Well, no. Actually, Your Honor, the judge did grant our motion to strike because it only came in through double hearsay and an affidavit from counsel. In a hearsay form. And that's not on assignment of error. But then he did not permit reopening of discovery to take a deposition of this one. Correct. Okay. So that, it seems to me, is pretty standard fare with discovery cutoffs. But, again, in your argument, you came back to the evidence isn't specific enough. And I'm having trouble seeing, not this remark, but the other evidence. I'm having trouble seeing under COSTA why it has to be specific, why it can't just be circumstantial. I understand your concern. And I'm at the nine-minute mark already, and I'd like to allow Ms. Saul the opportunity to address those issues as well. Thank you for your time. If there are no further questions. May it please the Court. I'm Karen Saul, and I'm here representing Electoral Central Credit Union. First of all, to address your question, Judge Gould, McGinnis does not cite to Godwin. It's our position that Godwin is still good law, and I'll explain my rationale for why. But how can, okay. But you will accept Godwin, excuse me, McGinnis saying, very little evidence is necessary to raise a genuine issue or fact regarding an employer's motive. Any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact find. Yes, McGinnis. That is a baseline as far as we're concerned, because that panel opinion does bind us. So now you're going to rely on what? You're going to take a pre-Costa case and argue that there's now some meaningful distinction between direct and circumstantial? No, I think I can explain how these cases actually are not inconsistent with each other, Your Honor. Okay. McGinnis still says, consistent with many Ninth Circuit precedents, that the plaintiff needs more than a presumption. Godwin, which was an earlier case, says it needs to be specific and substantial. And by the way, when I referenced McGinnis earlier, I guess I was thinking of Godwin. In other words, I thought the district court was applying with that specific and substantial language I cited. The Godwin test, which I am concerned doesn't survive Costa. Well, Godwin, I believe, was decided in 98. I believe it has been cited since then. When we shepherdized it, we didn't see any criticism of the case. Costa was decided in 2003, and it does say that direct and circumstantial evidence need to be given equal deference. Then you have the McGinnis case, which was decided in 2004, which cites to Costa but does not cite to Godwin. But it still says that you need more than the presumption raised under the McDonnell-Douglas framework, which is conceitedly what the plaintiff is relying on in this case. But there are cases saying that you can have the same evidence both make out the presumption and rebut as pretextual some counter- Absolutely. But if you look at those cases, Your Honor, the court observes in those that the plaintiff at the prima facie stage put on substantial evidence. And so in this case, all Mr. Cornwell has is the presumption raised under the McDonnell-Douglas framework. What's wrong with his evidence that Mr. Sharp didn't consult with him about a major reorganization that would shift away a good segment of his duties to someone else? I mean, normally one would think a corporation would enlist his help to transition duties. They might be able to do it a different way. But the fact that they don't consult with him seems a little unusual. I will address that. Before I lose my train of thought, can I make one other point on this Costa-Godwin? I think if you look at Rule 56E, which is still the rule that governs all of this, it says that the evidence has to be specific. And it has to go to a genuine issue of fact. And the NIDS case has said that the genuineness standard is a standard that goes to the quantum of evidence. And so that's why I think the cases that still talk about the substantiality of the evidence all make sense. And I think that Godwin, Costa, McGinnis all make sense. Now, with regard to your question, Your Honor, I think you need to go back further than the fall of 2001, when Mr. Sharp joined the credit union. The record shows that in 99, a sales culture was adopted. By 2000, changes were happening to a lot of people, not just Mr. Cornwell. But even at that point, he acknowledges that his focus started to shift 70% to lending. So when Mr. Sharp comes on, he's just continuing a trend that had begun two years before. And as Judge Bea observed, we concede he was the only one who was demoted, and we are calling it a demotion for purposes of this argument. But Mr. Sharp has testified he knew he wouldn't like that. The only place on the record, which is at ER 72, where he talks about meetings he had with other people, he mentions a list of, I think, four people. He does not mention, for example, another white VP-level person, Bonnie Cottrell. The record shows that she was the vice president, and there's no reference in the record of individual meetings with her either. May I ask a question of you? I've heard a couple of times that it is unusual not to consult with upper management before demoting them. I wonder, is there anything in the record from the plaintiff, from an expert on good management practices, that such pre-consultation is a standard of practice in this area? Is there anything about the credit management field which would require such consultation? There is nothing in the record, Your Honor. How do you deal with the issue raised by the director not responding to his statements? And I realize he phrased them in a deferential type of a way. He didn't say, I accuse this person of race discrimination, but he said, I don't know what's motivating Mr. Sharp. I don't know if it's the color of my skin or that he doesn't like me or, you know, he wants a woman. Why shouldn't the director then investigate that? Again, the record shows that he did raise it in the form of, I don't know why he's doing this to me. Could it be my skin color? Could it be my gender? Could it be because he doesn't like me? There is clearly an investigation because in February there are two letters issued, one to Mr. Sharp, one to Mr. Cornwell. And they say, you have the authority to make these changes. This is a board who two and a half or three years earlier had adopted a sales culture. I understand that they're investigating his inappropriate comments at a cocktail party at his house, and they're investigating whether he can make this change, whether he has the power to do that, which I would think a CEO would have the power to do. And they report back on those issues that Mr. Cornwell is out of luck. But they don't investigate, as far as I could tell from the record, the board did not investigate the color of my skin issue. You're right. And you're saying they didn't have to because it was phrased as a question. I'm saying they didn't have to partly because it was phrased as a question, but the question was, what caused this change? Why wouldn't that be a fact issue for a jury? Why couldn't a jury assess, okay, he made this statement. I don't know if it's the color of my skin. And in the context, which we can't really know here except by speculation, why couldn't a jury, hearing the evidence of his testimony and the director's testimony, decide if there should be an inference that the company was on notice, that there was a race discrimination complaint, and that they should investigate it? Well, again, Your Honor, I don't think it rises to the level of a complaint because it was phrased as a question of, why is he doing this? And the board concluded that they knew why he was doing it. It was the sales culture that had been unfolding for several years at this point. Where is that in the record that the board concluded that that's why he did what he did? I didn't notice it in those terms. It is in the record, and maybe it does take some inference, Your Honor. It is in the record that they were shifting to a sales culture. Yes. And the letter to both Mr. Cornwell and Mr. Sharp that were issued in February, February 12th, I believe, says that the board is ratifying the decision that Mr. Sharp had to make these changes. And you're right, Your Honor, I don't mean to mislead you, saying that it expressly says because of the sales culture, but that is the context of this case. This case is in a context where a corporation is reorganizing itself around a sales culture. Well, that's certainly the company's view of the context. Mr. Cornwell's view of the context is it's race discrimination. Couldn't a reasonable juror find that their failure to answer the charge or the question of race discrimination was simply sweeping under the rug because they didn't have an answer? Your Honor, I don't think a question of fact is raised here. And, first of all, with regard to the demotion issue, this had not even, I see my red lights on, this had not even come up, obviously, before the demotion issue. So, first of all, this evidence only goes to the retaliation issue. And if I had more time, I would be happy to explain why I think it doesn't go to the retaliation issue because there were a lot of other intervening events, including the May 23rd letter when he says. They're in your brief. Yes. That's why we have briefs. Thank you. Thank you both. The argument has been very helpful and very good, and we appreciate it for all counsel. Thank you. The letter is submitted and will be in recess until the next. Thank you.
judges: Fisher, Gould, Bea